**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

EWING OIL CO., INC.
  *Plaintiff*,

  *v.*                                                    Civil Action No. ELH-25-3848

SINJIN, INC., et al.
  *Defendants*.

**MEMORANDUM OPINION**

This case is rooted in a confessed judgment action filed in a Maryland court. The guarantors, who removed the case to federal court, seek to vacate the confessed judgments entered against them.

Ewing Oil Co., Inc. ("Ewing"), plaintiff, is a Maryland corporation that distributes gasoline and other petroleum products. ECF 4, ¶ 1. On December 23, 2019, Ewing entered into a written supply agreement with defendant Sinjin, Inc. ("Sinjin"), a New Jersey corporation that operated a gasoline station in Point Pleasant, New Jersey. *See* ECF 4, ¶¶ 2, 6; ECF 14-4 ("Supply Agreement").

Under the Supply Agreement, Ewing agreed to furnish gasoline and other petroleum products to Sinjin's station, and Sinjin agreed to purchase at least nine million gallons over a term of ten years, at a price equal to Ewing's cost of purchasing the product plus posted common carrier freight plus $0.031 per gallon. ECF 14-4, ¶¶ 1, 2, 3(b). On the same day, defendants Joseph S. Alsieux and 2149 Bridge Avenue, LLC ("Bridge") (collectively, the "Guarantors") executed a separate agreement, in which they guaranteed Sinjin's payment and performance obligations under the Supply Agreement. ECF 4, ¶¶ 10, 11; ECF 14-6 ("Guaranty"). The Guaranty, but not the Supply Agreement, contains a confessed judgment provision. ECF 14-6, ¶ 3; *see* ECF 14-4.

The parties' relationship deteriorated, with each side accusing the other of breaching the Supply Agreement.  Among other things, Ewing alleges that Sinjin stopped paying for fuel within the time required by the Supply Agreement and ceased operating its station.  ECF 4, ¶ 13.  In turn, the Guarantors contend that Ewing made unauthorized withdrawals from Sinjin's bank account, overcharged for fuel, failed to timely deliver fuel, and failed to install equipment required by the Supply Agreement.  ECF 7-1, ¶¶ 6, 9, 10, 11; *see* ECF 14-5 ("Amendment").

Ewing issued a notice of default to Sinjin on July 3, 2025.  ECF 14-7 ("Default Notice"). Sinjin responded by letter, offering to terminate the Supply Agreement "in ALL aspects."  ECF 7-3.  Ewing subsequently sent Sinjin a statement reflecting a zero balance on its account. ECF 7-4 ("Statement").

Thereafter, on October 16, 2025, Ewing filed suit in the Circuit Court for Washington County, Maryland, asserting a claim against Sinjin for breach of the Supply Agreement and seeking confession of judgment against the Guarantors.  ECF 4 ("Complaint"), ¶¶ 24, 27, 30. Ewing appended several exhibits to the Complaint.  *See* ECF 14-4 through ECF 14-10.  On October 21, 2025, the circuit court entered confessed judgments against Alsieux and Bridge, jointly and severally, in the amount of $419,258.55.  ECF 2-4; ECF 2-5.

About a month later, on November 24, 2025, the Guarantors removed the case to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446, on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332(a); ECF 1.  Thereafter, on December 1, 2025, the Guarantors moved to vacate, open, or modify the confessed judgments.  ECF 7. The motion is supported by a memorandum of law (ECF

7-1) (collectively, the "Motion") and multiple exhibits. *See* ECF 7-2 through ECF 7-10. Alsieux has verified the Factual Background of the Motion under the penalty of perjury. ECF 7-1 at 15. [1]

The Guarantors advance several grounds in support of the Motion. They contend that the confessed judgments must be vacated because they were not properly served with the confessed judgment papers. ECF 7-1 at 8–9. They also maintain that Sinjin has several merits defenses to the underlying breach claim, including material breach and set-off, which also operate as defenses to the Guaranty. *Id.* at 9–12. Further, they challenge the liquidated damages provision in Paragraph 8 of the Supply Agreement as an unenforceable penalty. *Id.* at 12–14. And, they argue that the parties mutually rescinded the Supply Agreement, as evidenced by Ewing's zero-balance Statement. *Id.* at 14–15.

Ewing opposes the Motion. ECF 14 ("Opposition"). As a threshold matter, Ewing contends that the Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine. ECF 14 at 3–4. On the merits, Ewing argues that the Guarantors have produced no evidence of breach or fraud by Ewing; that any claim regarding pricing or quantity is barred by the Supply Agreement's thirty-day written notice requirement; that the liquidated damages clause is enforceable as a reasonable forecast of damages and, in any event, as an acceleration clause; and that the parties did not mutually rescind the Supply Agreement. *Id.* at 6–15.

The Guarantors replied to the Motion. ECF 17 ("Reply"). In addition, Sinjin filed a "Motion to Dismiss for Insufficient Service of Process." ECF 8 ("Service Motion"). Ewing opposes the Service Motion. ECF 15. Sinjin replied. ECF 18.

---

[1] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

On February 11, 2026, Ewing filed proposed summonses for defendants (ECF 22), which the Court issued on February 17, 2026. ECF 23. The summonses were returned executed on April 3, 2026, as to all three defendants. *See* ECF 24 (Sinjin); ECF 25 (Bridge); ECF 26 (Alsieux). Defendants filed an Answer and Counterclaims on April 18, 2026. ECF 27. Therefore, on April 20, 2026, I denied the Service Motion, as moot. ECF 30.

On May 4, 2026, Ewing filed a "Motion to Dismiss Counterclaim and to Strike Affirmative Defenses" (ECF 32, "Motion to Dismiss"), and a "Motion for Costs due to Defendants' Failure to Waive Service" (ECF 33, "Costs Motion"). Defendants oppose both motions. ECF 38; ECF 39. Plaintiff's replies are due on June 1, 2026. Therefore, the Motion to Dismiss and the Costs Motion are not yet ripe. Accordingly, this Memorandum Opinion addresses only the Motion.

The Court held a telephone scheduling conference with the parties on May 11, 2026. *See* Docket. A Scheduling Order followed. *See* ECF 35.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion and vacate the confessed judgments.

## I. Factual Background

The Factual Background is drawn from the Complaint and its attached exhibits, the Factual Background set forth in the Motion, which is verified by Alsieux, and multiple exhibits attached to the Motion. [2]

---

[2] The parties do not address whether the Court may consider these exhibits in the context of the Motion. Notably, neither the defendant Guarantors nor plaintiff objects to the Court's consideration of these exhibits. Indeed, both sides rely on their own exhibits, and sometimes on those submitted by the opposition. For example, in support of the Motion, the Guarantors rely on the Supply Agreement, the Amendment, the Guaranty, and the Default Notice, all of which were attached to the Complaint by plaintiff. *See* ECF 7-1. Both sides also engage substantively with each other's exhibits. For example, in the Opposition, plaintiff does not contend that the Court may not consider the text messages and Statement that the Guarantors append to the Motion.

4

**A. The Parties' Written Agreements**

As noted, on December 23, 2019, Ewing and Sinjin entered into the Supply Agreement. *See* ECF 14-4.

Under the Supply Agreement, Ewing agreed to furnish gasoline and petroleum products to Sinjin, and Sinjin agreed to purchase gasoline and other petroleum products exclusively from Ewing for Sinjin's Liberty branded service station, located on Bridge Road in Point Pleasant, New Jersey (the "Premises"). ECF 4, ¶¶ 6, 8; ECF 7-1, ¶ 3. The Supply Agreement required Sinjin to purchase at least nine million gallons over a term of ten years, or until that volume was satisfied, whichever came later. ECF 14-4, ¶ 2. Sinjin was to pay Ewing the sum of its cost of purchasing, the posted common carrier freight amount, and $.031 per gallon, with payment by electronic funds transfer within four days of delivery. *Id.* ¶ 3(b). The Supply Agreement further contemplated the "conversion" of the Premises to a Liberty-branded station, which included the installation of Liberty signage and the sale of fuel "under the 'Liberty' trade name." *Id.* ¶ 2. According to the Complaint, "the conversion of the Premises to Liberty branded occurred on January 3, 2020." ECF 4, ¶ 21.

In addition, the Supply Agreement contains a liquidated damages clause. ECF 14-4, ¶ 8; *see* ECF 4, ¶ 18. It provides that, upon early termination, Sinjin would owe the difference between the contracted volume and the volume actually purchased, multiplied by $.031 per gallon. *Id.* An addendum (ECF 14-4 at 6-7, "Addendum A") further obligated Sinjin, upon termination of the Supply Agreement, to reimburse Ewing for a portion of the equipment installed at the Premises in the event of premature termination, subject to a 10 percent annual amortization beginning on the

___

Rather, plaintiff argues that the exhibits are insufficient to support the requested relief. ECF 14 at 9, 13.

second anniversary of conversion to a Liberty-branded station. ECF 14-4 at 6, ¶ (f); *see* ECF 4, ¶¶ 9, 20; ECF 7-1, ¶ 4. The Supply Agreement does not contain a confessed judgment clause. *See* ECF 14-4; *see also* ECF 7-1 ¶ 3.

Also on December 23, 2019, the Guarantors executed the Guaranty in favor of Ewing, by which they guaranteed Sinjin's payment and performance obligations under the Supply Agreement. ECF 14-6; *see* ECF 4, ¶¶ 10, 11; ECF 7-1, ¶ 5. Of import, the Guaranty authorizes the entry of judgment by confession against the Guarantors. ECF 14-6, ¶ 3; *see* ECF 4, ¶ 30. In particular, the Guaranty provides: "Guarantor further irrevocably authorizes and empowers any attorney-at-law or clerk of any court of competent jurisdiction of the State of Maryland, the State of New Jersey, or elsewhere to appear at any time for guarantor in any action brought against guarantor on this guaranty to confess or enter judgment against guarantor for his obligations under this guaranty, including court costs and reasonable attorneys' fees." ECF 14-6, ¶ 3.

On August 7, 2022, the parties executed the Amendment to the Supply Agreement. ECF 14-5. It extended the contract term by an additional 32 months and increased the volume commitment by 2,400,000 gallons. This brought the total supply to 11,400,000 gallons and extended the term through approximately twelve years and eight months after conversion of the Premises to a Liberty-branded station. ECF 14-9 (Contract Terms/Gallons Summary); *see* ECF 4, ¶¶ 7, 8. The Amendment requires Ewing to provide an additional $20,000 of investment toward equipment at the Premises (ECF 14-5, ¶ 3), and provides that the Amendment "may be amended only by a writing signed by all the parties hereto and not by oral statements or courses of dealing between the parties." *Id.* ¶ 4; *see* ECF 14 at 8; ECF 7-1 at 4.

**B. Course of Performance and Alleged Breaches**

Ewing asserts that, beginning on or about July 1, 2024, Sinjin breached its obligations under the Supply Agreement. ECF 4, ¶ 13.  Specifically, Ewing alleges that Sinjin failed and refused to pay for products within four days of delivery, as required by Section 3(a) of the Supply Agreement.  *Id.*  Further, Ewing maintains that Sinjin failed and refused to continue operating its Liberty branded service station at the Premises, contrary to Paragraph 7(a)(ii) of the Supply Agreement.  *Id.*

According to the Guarantors, beginning in the first few months after the Supply Agreement was executed, Ewing withdrew funds from Sinjin's bank account for fuel that was not delivered to Sinjin or that was delivered to unrelated retail stations.  ECF 7-1, ¶ 6.  The Guarantors assert that they identified improper withdrawals on June 9, 2020, August 9, 2020, November 4, 2020, May 21, 2021, and July 26, 2023, which totaled approximately $28,075.80. ECF 7-1, ¶ 6.  The Guarantors provide several invoices that they maintain demonstrate these unauthorized and improper withdrawals.  *See* ECF 7-2.

Further, the Guarantors assert that, after they discovered these improper withdrawals in or around February 2022, they raised the issue with Ewing, and the parties orally agreed to a "Modification Agreement" under which Ewing would refund the misappropriated funds.  The parties also agreed that Ewing would accept payment from Sinjin (a) by check rather than Automated Clearing House ("ACH"), (b) one load behind, and (c) up to eleven days after delivery, rather than four.  ECF 7-1, ¶ 7.  Moreover, the Guarantors allege that, approximately a year later, the parties agreed to resume ACH payments while leaving the remaining modified terms in place. *Id.* ¶ 8.

But, the Guarantors maintain that plaintiff subsequently breached this Modification Agreement. In particular, the Guarantors assert that Ewing refused to refund Sinjin $2,577.52 of the misappropriated funds. *Id.* ¶ 12. Further, after Sinjin agreed to resume ACH payments, Ewing improperly withdrew $2,982.09 from Sinjin's account for fuel ordered by an unaffiliated gas station. *Id.* Sinjin also asserts that Ewing continued to withdraw funds improperly from Sinjin's account less than eleven days after delivery, contrary to the Modification Agreement. *Id.* According to the Guarantors, these premature withdrawals resulted in "substantial harm to Sinjin's business, including bank overdrafts (totaling $2,062.00), and Defendants' ability to pay other creditors." *Id.* (citing ECF 7-10). In support of this contention, the Guarantors provide a notice from OceanFirst Bank N.A., demanding payment of $44,142.66 for a loan in default. ECF 7-10 at 1. The Guarantors also attach to the Motion a statement from the U.S. Small Business Administration demanding $29,624.60 for "delinquent government debt." *Id.* at 2.

In addition, the Guarantors assert that after Sinjin objected to Ewing's withdrawals on this shortened payment cycle, Ewing refused to deliver fuel from December 2023 to April 2024, and again from approximately July 2024 forward. ECF 7-1, ¶ 12. As a result of Ewing's refusal to supply the Premises with fuel, Sinjin's pumps were inoperable during these periods. *Id.*

Further, the Guarantors contend that, as evidenced by lower retail prices charged by nearby stations for which Ewing was also the supplier, Ewing repeatedly sold fuel to Sinjin at prices above the amount to which the parties had contractually agreed, *i.e.*, the cost of purchasing plus common carrier freight plus $0.031. ECF 7-1, ¶ 9. In support of this claim, the Guarantors provided photographs of nearby gas stations to demonstrate the prices at which other stations were selling fuel. ECF 7-9. The Guarantors also provided screenshots of text messages with "Tom", in which an individual, presumably Alsieux, sent these photos and wrote: "On top of that delta and gulf are

selling fuel for the same price I am purchasing it". *Id.* at 6.[3] He continued, *id.*: "Which is on the same road . Not even a mile away".

Further, the Guarantors assert that Ewing failed to timely deliver fuel on multiple occasions between October 2021 and July 2024. ECF 7-1, ¶ 10. The Guarantors identify twenty dates on which this allegedly occurred and state that the breaches "caused Sinjin to shut down its pumps for three to five days . . . totaling at 62 day [sic]." *Id.* For the days on which Sinjin had to close both of its pumps, the Guarantors contend that they also "lost approximately $4,100 and about half that when one pump was closed." *Id.* ¶ 13.

Moreover, the Guarantors contend that plaintiff failed to timely install equipment on the Premises pursuant to the Supply Agreement. *Id.* ¶ 11. In particular, they assert that plaintiff failed to install the canopy, as required by Addendum A. *Id.*; *see* ECF 14-4 at 7. Indeed, Addendum A states: "As part of this Agreement, Ewing will provide and install (as necessary) for the Purchaser's use, as soon as practicable after the date of this Agreement, the equipment (the 'Equipment') listed below to this Agreement." *Id.* at 6. The "List of Equipment" provides, in part: "Based on permitting approval, provide and install 30' x 35' canopy." *Id.* at 7.

The Guarantors also assert that the parties entered into the Amendment of August 7, 2022, as a result of Ewing's breach. ECF 7-1, ¶ 11. Pursuant to the Amendment, the Guarantors posit: "Plaintiff agreed to also install two new pumps at the premises in addition to the canopy.[]" *Id.*; *see* ECF 14-5, ¶ 3 ("Ewing will provide an additional $20,000 of investment toward the Equipment under Addendum A of the Agreement"). They maintain, ECF 7-1, ¶ 11 (citation omitted):

---

[3] Neither the Motion nor the text messages themselves identify the sender by name. Based on the substance of the messages, which reflect the perspective of the operator of the gas station, and on Alsieux's status as the principal of Sinjin and the signatory of the Verification appended to the Motion, the Court infers that Alsieux was the sender. ECF 7-1 at 15.

Plaintiff, however, wrongfully delayed installing the canopy pursuant to the parties' agreement for approximately 8 months. When Plaintiff finally got around to making the improvements, Plaintiff only installed the canopy, refusing to install the new pumps as promised. As a result of Plaintiff's dilatory performance of the improvements and ultimate refusal to install the new pumps as promised, one of Sinjin's pumps was inoperable for eight months (starting in approximately September of 2022)[], which forced Plaintiff [sic] to fix the old pumps for approximately $5,000.[4]

The Guarantors posit that Ewing's breaches "caused [Sinjin's] business to lose sales and substantial income." *Id.* ¶ 13. In particular, the Guarantors assert, *id.*: "Sinjin's sales dropped from 586,674 gallons of fuel in 2020 to 494,251 gallons in 2021 and 450,159 in 2022. These sales are substantially lower than the prior owner, who sold 979,598 gallons in 2016 and 961,013 gallons in 2017 and was on pace to sell 919,305 in 2018." They continue, *id.*: "By 2024, Sinjin was losing $146,000 a year as a result of the numerous closures and other strains caused by Ewing Oil's wrongdoing. Sinjin could no longer purchase fuel starting in the summer of 2024 based upon the wrongful conditions unilaterally imposed by Plaintiff."

### C. Default Notice

By letter dated July 3, 2025, Steven G. Hull, President of Ewing, provided a written Default Notice to Sinjin. ECF 14-7; *see* ECF 4, ¶ 14; ECF 7-1, ¶ 15. In the Default Notice, Ewing demanded payment of $30,494.16 within 4 days. ECF 14-7 at 1. Further, Ewing stated that if Sinjin did not "resume purchasing Product from us within ten days of the date of this letter . . . Ewing Oil will take that inaction as an indication that PURCHASER has *de facto* terminated the

---

[4] Although the Guarantors state that *plaintiff* was forced to fix the old pumps, this appears to be a typographical error. Indeed, in a footnote, the Guarantors explain: "At the time that the Parties entered into the Amended Supply Agreement, one of Sinjin's pumps was broken. Sinjin postponed repairing the broken pump because Plaintiff repeatedly promised to install the new pumps promptly, which would have obviated the need to make the repairs. If Sinjin had known that Plaintiff was going to delay the installation and then renege on its promise to install the new pumps altogether, Sinjin could have fixed the broken pump 8 months earlier and had two operable pumps on the Premises for the entire period." ECF 7-1 at 4, n.3.

10

agreement." *Id.* at 3 (italics in original); *see* ECF 7-1, ¶ 15.  Ewing alleges that, despite this demand and an opportunity to cure, Sinjin neither cured the payment default nor resumed regular purchases of fuel.  ECF 4, ¶ 14.

On July 9, 2025, Sinjin responded by letter, denying default and asserting that Ewing's own breaches had caused Sinjin's failure to pay.  ECF 7-3; *see* ECF 7-1, ¶ 16.  The letter states, ECF 7-3 (emphasis added):[5]

> This letter is in response to your most recent correspondence via certified mail. The accusations of being in default are incorrect. Ewing Oil has been in breech [sic] of their contract from our first months of business together by setting Sinjin Inc. up for failure with actions of the following: Ewing Oil has fluctuated money in & out of my bank account charging Sinjin for other business' fuel loads fraudulently numerous times in the upwards amount of $57,800.00. When I brought this to Ewing Oil's attention their response in compromise to their detrimental actions was a verbal & new written contract that Sinjin Inc. would be given a full load of gas followed by another truck load of gas, with payment only being due for the second load. Making Sinjin's payment status after those deliveries "one truck load behind". I have to this date yet to receive either of those loads of gas. On top of the fact that Ewing Oil would sell Sinjin gas at fraudulent rack prices & not deliver my loads of fuel leaving Sinjin, Inc. without gas for 3-5 days repetitively. My rack price when I would receive the loads of fuel would be one penny less per gallon than what it is being sold to consumers for at the nearest gas station to my business location making my profit margin non existent. Ewing Oil has not upheld their end of the contract leaving my business with the only option of failure solely because of their actions listed above & immoral business tactics. In conclusion, if you would like to terminate our contract, I would be more than willing to move forward in doing so due to the circumstances. **If in agreement with the termination, Sinjin would pay the last truck load of gas as long as it is inclusive of & in writing that Sinjin's contract is fully terminated & paid in full in ALL aspects.** Please send response via written documentation only. Thank you.

---

[5] The version of the letter submitted by the Guarantors appears to be a scanned copy containing several typographical irregularities involving ampersands.  In multiple places, the text displays "&amp;" in place of an actual ampersand.  For clarity, I have corrected these instances by replacing "&amp;" with "&" in any quotations from the letter.

On July 31, 2025, Ewing sent Sinjin a Statement showing a zero-balance due. ECF 7-4 at 2.[6]

### D. State Court Action and Confessed Judgments

As noted, on October 16, 2025, Ewing filed suit in the Circuit Court for Washington County. Plaintiff asserted a claim against Sinjin for breach of the Supply Agreement (Count I) and sought confession of judgment against the Guarantors under the Guaranty (Count II). ECF 4, ¶¶ 24, 27, 30; ECF 7-1, ¶ 18.

The next day, October 17, 2025, plaintiff filed an "Order for Entry of Judgment by Confession," in which it asked the Clerk to enter confessed judgments against Alsieux and Bridge. ECF 2-6. The circuit court entered the confessed judgments on October 21, 2025, as to Bridge (ECF 2-4) and Alsieux (ECF 2-5), jointly and severally, each in the sum of $419,258.55. *See also* ECF 4 at 9. This amount was calculated by adding $409,922.43 in principal, $4,836.12 in pre-judgment interest through September 30, 2025, and $4,500 in attorney's fees. *Id*. Of relevance, the notices of confessed judgment advised that the Guarantors had thirty days to move to open, modify, or vacate the judgments. ECF 2-4; ECF 2-5.

On October 28, 2025, plaintiff filed in the Circuit Court for Washington County affidavits of service for the Complaint and the confessed judgment papers. ECF 9-7, 9-8, 9-9. These indicated that all three defendants were personally served at the Premises on October 25, 2025. *Id.*; ECF 14 at 2, ¶ 3; ECF 7-1, ¶ 19 & Ex. D.[7]

---

[6] The parties do not address whether there were any other communications between them from July 9, 2025, to July 31, 2025. It is also unclear whether Sinjin paid for "the last truck load of gas", as it offered to do in its letter. ECF 7-3.

[7] Seemingly in an effort to moot defendants' disputes regarding the propriety of the initial service, on March 28, 2026, plaintiff again served defendants. *See* ECF 24 (Sinjin); ECF 25 (Bridge); ECF 26 (Alsieux).

12

On November 14, 2025, counsel entered an appearance in the Circuit Court for Washington County on behalf of all three defendants.  ECF 9-11; ECF 14 at 2 ¶ 4.  Then, on November 24, 2025, the Guarantors moved for an extension to respond to the confessed judgments.  ECF 9-12.  On the same day, defendants removed the case to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446.  ECF 1; ECF 7-1, ¶ 21; ECF 14 at 2, ¶ 4.

## II. Legal Principles

### A.

The parties have not addressed choice of law issues.  But, both sides rely on Maryland law.

The Supply Agreement states, ECF 14-4, ¶ 13: "This Agreement shall be governed and construed in accordance with the laws of the State of Maryland and the courts of the State of Maryland shall have exclusive jurisdiction over any claims or controversies which arise under this Agreement."[8]

---

[8] The Fourth Circuit has found that "forum selection clauses that use the term 'of [a state]' connote sovereignty, limiting jurisdiction over the parties' dispute to the state courts of the named state."  *FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 755 (4th Cir. 2010) (alteration in original).  And, because "federal courts are not courts 'of' the state of [Maryland], the contract language at issue refers to sovereignty rather than geography and limits jurisdiction over the parties' dispute to state court."  *Id.*  The forum selection clause at issue here is precisely this kind of sovereignty-based clause, providing that "the courts of the State of Maryland shall have exclusive jurisdiction" over disputes arising under the Agreement.  ECF 14-4, ¶ 13.

A forum selection clause, however, "has nothing to do with subject-matter jurisdiction."  *Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 680 (4th Cir. 2018); *see Law Offices. of Mark J. Muffoletto, LLC v. Am. Recovery Serv. Inc.*, DKC-21-116, 2021 WL 1060345, at *3 (D. Md. Mar. 19, 2021).  "Thus, in the removal context, an enforceable forum-selection clause essentially operates as an affirmative defense to removal—subject-matter jurisdiction exists, but the forum-selection clause effects a waiver of the defendant's right to ask the court to exercise that jurisdiction."  *Bartels by & through Bartels*, 880 F.3d at 681.  Therefore, "a defendant will have to raise the forum selection issue in [its] first responsive pleading, or waive the clause."  *Sucampo Pharms., Inc. v. Astellas Pharma., Inc.,* 471 F.3d 544, 549 (4th Cir. 2006).

13

Maryland applies the law of the state in which the contract was formed ("lex loci contractus"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995). Plaintiff is based in Maryland, while defendants are based in New Jersey. ECF 1. Although the parties are located in different states, and the Supply Agreement governs a service station located in New Jersey, the parties expressly agreed in the Supply Agreement to be bound by Maryland law. For these reasons, and because neither side argues otherwise, I shall apply Maryland law.

Under Maryland law, a confessed judgment is a "device designed to facilitate collection of a debt." *Schlossberg v. Citizens Bank,* 341 Md. 650, 655, 672 A.2d 625, 627 (1996). A confession of judgment clause, occasionally described more archaically as a "cognovit," is a provision that is sometimes included in a debt instrument, by which the debtor "agree[s] to the entry of judgment against [the debtor] without the benefit of a trial in the event of default on the debt instrument." *Id.*; *see also* Black's Law Dictionary (12th ed. 2024) (definitions of "cognovit" and "confession of judgment").

"As a general rule, a judgment by confession is 'entitled to the same faith and credit, as any other judgment.'" *Schlossberg,* 341 Md. at 655, 672 A.2d at 627 (quoting *Keiner v. Commerce Trust Co.,* 154 Md. 366, 370, 141 A. 121, 122 (1927)). Like a money judgment entered in any other judicial proceeding, a "confessed judgment operates as a lien against the real property of the

---

The vehicle for asserting this defense in the present posture is a motion to remand. But, 28 U.S.C. § 1447(c) provides: "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)." Here, Ewing did not move to remand within the thirty-day window. *See* Docket. Therefore, any objection to removal grounded in the forum selection clause of the Supply Agreement has been waived.

defendant located in the county where the judgment is entered." *Schlossberg,* 341 Md. at 655, 672 A.2d at 627.

In Maryland State courts, confessed judgments are now governed by Maryland Rule 2–611. *See Schlossberg,* 341 Md. at 655, 672 A.2d at 627; *NILS, LLC v. Antezana,* 171 Md. App. 717, 726, 912 A.2d 45, 50 (2006), *cert. denied,* 397 Md. 397, 918 A.2d 469 (2007). Maryland Rule 2–611 provides that an action seeking a confessed judgment is initiated by filing a complaint, accompanied by a copy of the written debt instrument containing an authorization by the debtor to confession of judgment and an affidavit in a prescribed form, in which the plaintiff must provide, *inter alia,* a statement of the amount due and owing under the instrument and proof of how that amount was determined. *See* Md. Rule 2–611(a). Thereafter, the court must review the complaint and affidavit for sufficiency and ascertain whether "the pleadings and papers demonstrate a factual and legal basis for entitlement to confessed judgment." Md. Rule 2–611(b). If so, the court must direct entry of judgment. *Id.* "Promptly upon entry of a judgment by confession, the clerk, instead of a summons, shall issue a notice informing the defendant of entry of judgment and of the latest time for filing a motion to open, modify, or vacate the judgment." Md. Rule 2–611(c).

The Maryland Court of Special Appeals[9] traced the history of confessed judgments in Maryland in the case of *Alger Petroleum, Inc. v. Spedalere,* 83 Md. App. 66, 73–76, 573 A.2d 423,

---

[9] In the Maryland general election in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. I shall refer to the courts by the names that were in effect when the cited decisions were issued.

427–28 (1990) (citing, *inter alia, Remsburg v. Baker,* 212 Md. 465, 129 A.2d 687 (1957); *Keiner v. Commerce Trust Co.,* 154 Md. 366, 141 A. 121 (1927); and *Tyrrell v. Hilton,* 92 Md. 176, 48 A. 55 (1901)), *cert. denied,* 320 Md. 800, 580 A.2d 219 (1990). As the *Alger* Court explained, the practice of entry of judgment by confession arose from early procedures that permitted the clerk of court to enter a judgment during time periods when the court was in recess, based on the written consent of the parties or their attorneys. *See Alger Petroleum, Inc.,* 83 Md. App. at 73, 573 A.2d at 427.

Until 2010, confessed judgments were entered by the clerk of court as a ministerial act, upon the filing of the plaintiff's complaint, and were not scrutinized by the state court until and unless the defendant moved to open, modify, or vacate the judgment. *See, e.g., Garliss v. Key Fed. Sav. Bank,* 97 Md. App. 96, 103, 627 A.2d 64, 67–68 (1993) ("Confession of judgment is not a judicial act, but rather the *pro forma* entry of a judgment by the clerk of the circuit court."). The requirement for documentation and judicial review before entry of confessed judgment, outlined above, was adopted by the Maryland Court of Appeals in 2010, upon the recommendation of the Chief Judge of the District Court of Maryland, to address the concern that confessed judgments were too easily obtained on the basis of illegal contracts or fraudulent misrepresentations. *See* Rules Order of Mar. 9, 2010, 37 Md. Reg. 531 (Mar. 26, 2010); *see also* Md. Standing Cmte. on Rules of Practice & Procedure, 163rd Report, at 88 (Jan. 13, 2010) (reporter's note to proposed amendments to Md. Rules 2–611 & 3–611); *SunTrust Bank v. Goldman,* 201 Md. App. 390, 399–400 & nn. 3–4, 29 A.3d 724, 729 & nn. 3–4 (2011) (discussing 2010 amendments to confessed judgment rules).

Local Rule 108.1 of the U.S. District Court in Maryland governs the entry of judgment by confession in this Court. *See TD Bank, N.A. v. Graffiti Healthcare Providers Inc.*, DKC 24-255,

16

2024 WL 3555125, at *1 (D. Md. July 25, 2024); *see also Sager v. Housing Com'n of Anne Arundel County*, 855 F. Supp. 2d 524, 553 n.37 (D. Md. 2012) (noting that the Rules of Procedure governing confessed judgments in Maryland State courts "are analogous to this Court's procedures with respect to confessed judgments" (citing Local Rule 108.1))).  Local Rule 108.1(a) provides:

> A complaint requesting the entry of judgment by confession shall be filed by the plaintiff accompanied by the written instrument authorizing the confession of judgment and entitling the plaintiff to a claim for liquidated damages and supported by an affidavit made by the plaintiff or someone on that party's behalf stating the specific circumstances of the defendant's execution of said instrument and including, where known, the age and education of the defendant, and further including the amount due thereunder, and the post office address (including street address if needed to effect mail delivery) of the defendant.

Moreover, Local Rule 108.1(b) provides:

> Upon review of the aforesaid documents, the Court may direct the entry of judgment upon a finding that the aforesaid documents prima facie establish (1) a voluntary, knowing, and intelligent waiver by the defendant of the right to notice and a prejudgment hearing on the merits of the claim of the plaintiff for liquidated damages and (2) a meritorious claim of the plaintiff for liquidated damages against the defendant.

A motion to open, modify, or vacate a confessed judgment in this Court is governed by Local Rule 108.1(e), which provides: "If the evidence presented establishes that there are substantial and sufficient grounds for an actual controversy as to the merits of the case, the Court shall order the judgment by confession vacated, opened, or modified."  *See Choice Hotels Int'l, Inc. v. Sonora Sun Mgmt. Ltd. P'ship, L.L.P.*, 162 F. App'x 247, 249 (4th Cir. 2006); *Sager*, 855 F. Supp. 2d at 553.

## B.

Confessed judgments are disfavored by Maryland courts.  *See Choice Hotels Int'l, Inc.*, 162 F. App'x at 249 ("Confessions of judgment are generally disfavored in Maryland because of

their potential for abuse."); *see Pease v. Wachovia SBA Lending, Inc.,* 416 Md. 211, 230, 6 A.3d 867, 878–79 (2010); *Garliss,* 97 Md. App. at 103, 627 A.2d at 68. In *Burris v. Richards,* 79 Md. App. 554, 558 A.2d 750, *cert. denied,* 317 Md. 510, 564 A.2d 1182 (1989), the court observed that, unlike a conventional judicial proceeding, "[i]n the case of a confessed judgment . . . , the defendant's first notice is of the entry of judgment by confession, which means that the defendant has no opportunity, prior to entry of judgment, to raise any defenses or file any pleadings or papers." *Id.* at 565 n. 8, 558 A.2d at 756 n. 8 (internal citation omitted). Therefore, considering "the ease with which a creditor may obtain a confessed judgment and the potential for fraud and abuse," challenges to confessed judgments are liberally construed. *Goshen Run Homeowners Ass'n, Inc. v. Cisneros*, 467 Md. 74, 79, 223 A.3d 917, 920 (2020). Judgments by confession "are to be freely stricken out on motion to let in defenses." *Schlossberg,* 341 Md. at 655, 672 A.2d at 627 (citation and quotation marks omitted).

The moving party bears the burden of presenting evidence sufficient to show the asserted defense, but "[t]his burden is not a heavy one [.]" *Gambo v. Bank of Maryland,* 102 Md. App. 166, 185, 648 A.2d 1105, 1114 (1994) (Hollander, J.); *see Billingsley v. Lincoln Nat'l Bank,* 271 Md. 683, 689–90, 320 A.2d 34, 38 (1974) (explaining that debtors "are given every opportunity after judgment to present any defenses which they may have and, in doing so, are merely required to meet a standard that is a minimal obstacle") (quotation marks omitted).

Judge Grimm, while a magistrate judge, described the process as follows:[10]

> Put another way, the issue is whether the motion "rais[es] a genuine issue of material fact sufficient to constitute a meritorious defense to the confessed judgment." *Signet Bank/Md. v. Wellington*, 968 F.2d 1212 [(4th Cir. 1992)]; *Steamship Trade Ass'n of Balt., Inc. v. Peters*, No. 09-cv–109-WDQ, 2009 WL 2924810, at *2 (D. Md. Sept. 9, 2009) (quoting *Signet Bank*[, 968 F.2d at 1212]). "[A]ll that is necessary to establish the existence of a 'meritorious defense'

---

[10] Judge Grimm subsequently became a U.S. District Judge.

is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party," or, in this case, the defendant. *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). However, "[t]he 'mere assertion of a defense is insufficient to satisfy the burden of proof necessary to vacate a confessed judgment.'" *Steamship*, 2009 WL 2924810, at *2 (*quoting Leasing & Fin., Inc. v. IPM Tech., Inc.*, 885 F.2d 188, 194 (4th Cir. 1989)).

*Aeons Centro de Administracao de Empresas, Ltd. v. Cent. Bank of Nigeria*, BEL-11-3447, 2012 WL 2675259, at *3 (D. Md. July 3, 2012), *report and recommendation adopted sub nom. Aeons Centro De Administracao De Empresas LTD v. Cent. Bank of Nigeria*, BEL-11-3447, 2012 WL 3233523 (D. Md. Aug. 3, 2012).

In *Stankovich v. Lehman*, 230 Md. 426, 432, 187 A.2d 309, 313 (1963), the Maryland Court of Appeals summarized the movant's burden as follows:

> To be successful in moving to strike a judgment by confession, one must adduce evidence in support of his motion sufficient to persuade the fair and reasoned judgment of an ordinary man that there are substantial and sufficient grounds for an actual controversy as to the merits of the case. If he does so, he is deemed to have met the burden of showing he has a meritorious defense, without the necessity of showing he will eventually prevail. This is to say that if the evidence is such that persons of ordinary judgment and prudence could fairly draw different inferences from it, the controversy should not be decided as a matter of law but instead should be submitted to a trier of fact. If a meritorious defense is made out (by affidavits or testimony) . . . , the Court should liberally exercise its equitable jurisdiction over judgments entered by confession and, on application of a defendant who prima facie shows such defense, vacate the judgment to permit a trial on the merits.

*See Young v. Mayne Realty Co., Inc.,* 48 Md. App. 662, 668, 429 A.2d 296, 299 (1981); *NILS, LLC v. Antezana,* 171 Md. App. 717, 727, 912 A.2d 45, 51 (2006); *see also Remsburg v. Baker,* 212 Md. 465, 469, 129 A.2d 687, 688 (1957)) (explaining that motion should be granted "if the evidence adduced in support of the motion is sufficient to persuade the fair and reasoned judgment of an ordinary man that there are substantial and sufficient grounds for an actual controversy as to the merits of the case").

19

In the Motion, the Guarantors cite the Complaint and several exhibits attached to it. *See* ECF 7-1. In particular, in the Motion, the Guarantors cite the Supply Agreement (ECF 14-4), the Amendment (ECF 14-5), the Guaranty (ECF 14-6), and the Default Notice (ECF 14-7), all of which are attached to the Complaint, but not the Motion.

Under Federal Rule of Civil Procedure 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

To be sure, the Motion is not brought pursuant to Fed. R. Civ. P. 12(b)(6). But, in my view, the standard is instructive. Maryland Rule 2-611(a) required plaintiff to attach the underlying instruments to its Complaint to obtain a confessed judgment in the first instance. And, Maryland Rule 2-611(b) directed the state court to enter the confessed judgment only if "the pleadings and papers" demonstrated "a factual and legal basis for entitlement." The Supply Agreement, Amendment, Guaranty, and Default Notice were therefore part of the record on which

the confessed judgments rest.  They remain part of the record this Court must examine on the present Motion.  Were I to ignore these exhibits, I would be hamstrung when determining whether an "actual controversy as to the merits of the case" exists.  L. R. 108.1(e).  Therefore, the Court must consider the Complaint and its attached documents.

### III. Discussion

### A.

As a threshold matter, plaintiff contends that, under the *Rooker-Feldman* doctrine, the Court lacks jurisdiction to entertain the Guarantors' Motion.  ECF 14 at 3–4.  In general, the *Rooker-Feldman* doctrine provides that "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam).  The doctrine derives from two Supreme Court cases: *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).[11]

---

[11] In *Thana v. Bd. of License Comm'rs for Charles Cty.,* 827 F.3d 314, 319 (4th Cir. 2016), the Court reviewed both cases, stating:

> In *Rooker*, a party that lost before the Indiana Supreme Court and that failed to obtain review by the U.S. Supreme Court filed an action in federal district court, challenging the constitutionality of the state court judgment and seeking to have it declared "null and void." 263 U.S. at 414–15.  Affirming the district court's dismissal of the federal suit for lack of subject matter jurisdiction, the Supreme Court ruled that the federal suit amounted to an appeal of the state court judgment and that Congress had vested jurisdiction to entertain such an appeal only in the Supreme Court. *Id.* at 415–16.

> In *Feldman*, the plaintiffs sued the District of Columbia's highest court in federal district court after the District of Columbia court denied their requests for a waiver of a bar membership rule. 460 U.S. at 468. Again, the Supreme Court affirmed dismissal of the case, holding that while the plaintiffs could challenge the constitutionality of the bar admission rule itself in a federal district court, they could not challenge the District of Columbia court's judgment denying their waiver petitions in a federal district court. *Id.* at 482–83.

In *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005), the Supreme Court explained that the doctrine prohibits a federal district court from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *See T.M. v. Univ. of Maryland Med. Sys. Corp.*, 139 F.4th 344, 348 (4th Cir. 2025), *cert. grante*d, 146 S. Ct. 878 (2025); *Hulsey v. Cisa*, 947 F.3d 246, 250 (4th Cir. 2020); *Phillips v. Maryland Bd. of L. Examiners,* 812 F. App'x 165 (4th Cir. 2020) (per curiam); *Thana v. Bd. of License Comm'rs for Charles Cty.,* 827 F.3d 314, 319 (4th Cir. 2016); *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 233 (4th Cir. 2015); *see also Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006) (stating that "the doctrine forbids claims that 'seek [ ] redress for an injury caused by the state-court decision itself' because they 'ask[ ] the federal district court to conduct an appellate review of the state-court decision.'") (quoting *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006)) (alterations in *Adkins*); *accord Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003).

The *Rooker-Feldman* doctrine derives from 28 U.S.C. § 1257, which vests the United States Supreme Court with jurisdiction to hear appeals from state court decisions in cases raising questions of federal law, and from the Congressional "assignment" of original subject matter jurisdiction to the federal district courts in a host of matters. *Thana*, 827 F.3d at 318; *see id.* at 319; *see also T.M.*, 139 F.4th at 354; *Adkins*, 464 F.3d at 463-64. Notably, "no federal statute 'authorize[s] district courts to exercise appellate jurisdiction over state-court judgments,' even those that raise issues of—or are alleged to violate—federal law." *T.M.*, 139 F.4th at 348 (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002)) (alteration in *T.M.*). As the Court said in *Stillwell*, 336 F.3d at 319: "[T]he *Rooker-Feldman* doctrine . . .

22

preserves the independence of state courts as well as congressional intent that an appeal from a state court decision must proceed through that state's system of appellate review rather than inferior federal courts."

The doctrine is "narrow and focused," and it "should be applied no broader than the holdings in the two cases from which the doctrine takes its name." *Thana*, 827 F.3d at 319 (citing *Exxon*, 544 U.S. at 284). The *Exxon* Court warned that an expansive construction of the doctrine threatens to "overrid[e] Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and [to] supersed[e] the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Exxon*, 544 U.S. at 283 (alterations added).

Relying principally on *Wendy's Netherlands B.V. v. Levy*, MHW-24-3077, 2025 WL 2605408 (S.D. Ohio July 21, 2025), plaintiff argues that a "spectrum" has emerged among federal courts with respect to the applicability of the *Rooker-Feldman* doctrine in a posture such as this. ECF 14 at 4. On one end of the range, courts have held that the *Rooker-Feldman* doctrine "precludes federal jurisdiction upon removal over confessed judgments that have not been stricken or opened in state court." *Wendy's Netherlands B.V.,* 2025 WL 2605408, at *3. The court characterized the Fourth Circuit as "[i]n the middle" of the range of approaches, "requiring that any motions to set aside the state-court judgment be filed in state court prior to removal." *Id.*.

Therefore, plaintiff maintains that any motion to set aside a state court confessed judgment must be filed in state court before removal of the case to federal court. ECF 14 at 4 (citing *Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 483 (4th Cir. 2015) (per curiam)). The Guarantors argue, in part, that the doctrine is inapplicable. ECF 17 at 3. They assert that "the state court never made a substantive decision on the merits, and Defendants are not asking this Court to revisit any arguments decided by the state court." *Id.*

23

In my view, plaintiff improperly construes *Westlake*.  In *Westlake*, 599 F. App'x at 483, the Court concluded only that the *Rooker-Feldman* doctrine did not apply when the defendant "removed an existing state case where a motion to set aside the judgment was pending."  It did not hold, expressly or by implication, that a motion to vacate must be filed in state court before removal in order for a federal court to entertain it.  The *Westlake* Court was never asked whether jurisdiction would exist if a motion to vacate is filed after removal, and it did not decide that question.  Questions "which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  *Webster v. Fall*, 266 U.S. 507, 511 (1925).  Ewing cites no other authority for the proposition that the *Rooker-Feldman* doctrine applies in a procedural posture such as this one.

I am persuaded that the instant action does not implicate the *Rooker-Feldman* doctrine.  This is because "the *Rooker–Feldman* doctrine has no application to a properly removed case where, as here, there is no attack on a separate and final state-court judgment."  *Jenkins v. MTGLQ Invs.*, 218 F. App'x 719, 724 (10th Cir. 2007).

Fundamentally, the confessed judgments entered in a Maryland State court against the Guarantors were not final when this case was removed.  The orders entered by the Circuit Court for Washington County expressly permitted the Guarantors to move to vacate within 30 days.  ECF 2-4, 2-5.  And, that period had not expired when the Guarantors removed the case on November 24, 2025.

Of import, the State court did not substantively decide the merits of such a motion.  The Guarantors had not even filed a motion to vacate, open, or modify the confessed judgments in State court when they removed the case.  Indeed, the confessed judgments were subject to a still-open

period for vacatur, and they were not final, so as to trigger *Rooker-Feldman*. *See Davani,* 434 F.3d at 719.

Because the deadline to file a motion to vacate the confessed judgments had not expired, and there were no final judgments in the State court, the *Rooker-Feldman* doctrine poses no obstacle. Therefore, I shall consider the merits of the Motion. *See, e.g.*, *Chaz Const., LLC v. Codell*, 137 F. App'x 735, 743 (6th Cir. 2005) ("[I]n cases involving removal, the district court is instructed to 'take [ ] up the case where the State court left it off.'" (quoting *Duncan v. Gegan*, 101 U.S. 810, 812 (1879))); *Munsey v. Testworth Lab'ys*, 227 F.2d 902, 903 (6th Cir. 1955) ("Prior to removal the state court judgment was concededly subject to being set aside in the state court. It was subject to the same hazard in the federal court after removal.").

**B.**

The Guarantors advance several arguments in support of the Motion. They contend that the confessed judgments should be vacated because they were not properly served. Moreover, they argue that Sinjin possesses several merits defenses to the underlying breach claim, namely material breach and set-off, which also operate as defenses to the Guaranty. ECF 7-1 at 9–12. Further, they insist that the parties mutually rescinded the Supply Agreement, as demonstrated by the Statement that Ewing sent to Sinjin with a zero balance. *Id.* at 14–15.

A guarantor possesses all of the defenses available to the principal debtor. Therefore, the Guarantors may assert defenses belonging to Sinjin. *Bessette v. Weitz*, 148 Md. App. 215, 239, 811 A.2d 812, 825 (2002). As indicated, to vacate a confessed judgment the Court need not be convinced that any particular defense will ultimately succeed. The requisite standard asks only whether "persons of ordinary judgment and prudence could fairly draw different inferences" from

the record.  *Young*, 48 Md. App. at 668, 429 A.2d at 299 (citation omitted).  Several of the Guarantors' defenses meet that bar.

The Guarantors' mutual rescission defense would extinguish the Supply Agreement itself and the obligations flowing from it, leaving no debt to support the confessed judgments in any amount and warranting vacatur of the confessed judgments.  The Guarantors' remaining breach-related defenses go to the amount of the debt rather than its existence.  Therefore, if accepted as establishing substantial and sufficient grounds for actual controversies, these defenses would support opening the confessed judgments, rather than vacating them.

### 1. Mutual Rescission

As discussed, on July 9, 2025, Sinjin responded to Ewing's Default Notice by identifying Ewing's breaches, denying that Sinjin was in default, and offering to fully terminate the contract "in ALL aspects."  ECF 7-3.  Then, on July 31, 2025, Ewing provided Sinjin with the Statement, reflecting that Sinjin had a zero balance.  ECF 7-4.

The legal significance of Ewing's Statement is contested.  The Guarantors contend that the zero balance reflects Ewing's acceptance of Sinjin's offer to terminate the agreement by mutual assent. ECF 7-1 at 15.  As the Guarantors put it, the Statement "is absolutely incompatible with Plaintiff's current argument that Defendants owe it $419,258.55, which includes charges waived by the July 31, 2025 invoice."  ECF 17 at 12 (citation omitted).

Ewing disputes this characterization, arguing that any termination required a signed writing and that the Statement does not constitute acceptance of any offer to terminate.  ECF 14 at 13. And, plaintiff points out that, even if the Statement could be construed as an acceptance, Sinjin failed to perform the condition attached to its own offer, namely that, upon termination, "Sinjin 'would pay the last truck load of gas.'"  *Id.* at 14 (quoting ECF 7-3).  According to Ewing, the

26

Guarantors do not show, or even allege, that Sinjin in fact made that payment, which defeats any inference that the parties' communications culminated in a mutual rescission. ECF 14 at 14.

Under Maryland law, "the mutual assent requisite to rescind a contract need not be express; it may be inferred from the conduct of the parties in the light of the surronding [sic] circumstances." *Vincent v. Palmer*, 179 Md. 365, 372, 19 A.2d 183, 188 (1941); *see Maslow v. Vanguri*, 168 Md. App. 298, 326, 896 A.2d 408, 425 (2006) (Hollander, J.). Indeed, "[i]f either party expresses an intention to abandon the performance of a contract, and the other party fails to object, there may be circumstances justifying the inference that the other party has assented thereto." *Maslow*, 168 Md. App. at 326, 896 A.2d at 425. And, "[e]ven circumstances of a negative character, such as the failure of both parties to take any steps looking to the enforcement of the contract, may sometimes amount to mutual assent to rescind it." *Id.*

Regardless, at this stage, the question is not whether the Statement, standing alone, formally satisfies the requirements of contract formation. Rather, "the standard required to vacate a confessed judgment is a liberal one, 'requiring only a minimal showing of evidence.'" *Choice Hotels Int'l, Inc. v. Thakorji, Inc.,* PX-22-3092, 2023 WL 8257947, at *2 (D. Md. Nov. 29, 2023) (cleaned up) (quoting *Signet Bank,* 968 F.2d at 1212). And, the Court evaluates whether the parties' conduct is such that "persons of ordinary judgment and prudence could fairly draw different inferences from it" as to mutual assent to rescind, which would warrant submission to a trier of fact rather than resolution as a matter of law. *Young*, 48 Md. App. at 668, 429 A.2d at 299; *see Vincent*, 179 Md. at 372, 19 A.2d at 188.

In my view, that inference is plainly available. Therefore, the Guarantors have satisfied the standard to vacate the confessed judgments. Sinjin's letter of July 9, 2025 was, on its face, a conditional offer to terminate the Supply Agreement "in ALL aspects." ECF 7-3. Three weeks

later, without any intervening correspondence reasserting the alleged default, Ewing sent Sinjin a Statement reflecting a zero balance.  ECF 7-4.  The Statement, on its face, is difficult to reconcile with plaintiff's present demand for more than $400,000 on the very same account.  A reasonable person could fairly conclude that the zero-balance Statement was Ewing's assent to the offered termination.  And, because the Guaranty secures only Sinjin's obligations under the Supply Agreement, extinguishment of those obligations through mutual rescission eliminates the predicate for any liability under the Guaranty.  One could also reason that the Statement was a clerical artifact carrying no contractual weight due to the fact that it did not explicitly state that the Supply Agreement was terminated.  Either inference is "fairly draw[n]," which is sufficient to vacate the confessed judgments. *Young*, 48 Md. App. at 668, 429 A.2d at 299.

Plaintiff's arguments to the contrary are not without force, but none is dispositive at this stage. Plaintiff argues, ECF 14 at 13, that any termination by mutual assent runs afoul of the Amendment's no-oral-modification clause, which states that the Amendment "may be amended only by a writing signed by all the parties hereto."  ECF 14-5, ¶ 4.  Ewing contends that because the Statement is not "signed by all the parties," it is an unenforceable modification to the Supply Agreement.  ECF 14 at 13.  Maryland law, however, permits parties to waive or modify a no-oral-modification provision through subsequent agreement or conduct.  *Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.*, 165 Md. App. 262, 277, 885 A.2d 381, 390 (2005).  "Whether or not the subsequent conduct of the parties amounts to a waiver is a question of fact to be decided by the trier of the fact." *Hoffman v. Glock,* 20 Md. App. 284, 289, 315 A.2d 551, 555 (1974) (citation omitted).

Moreover, plaintiff argues that the result is the same in any event because the liquidated damages clause applies upon "any termination," whether by breach or by mutual agreement.  ECF

28

14 at 14 (citing ECF 14-4, ¶ 8(b)).  Therefore, plaintiff avers that even if it had accepted Sinjin's "offer to terminate," Sinjin "remained liable to pay Ewing $0.031 per gallon remaining under the Agreement."  ECF 14 at 14.  But, whether the liquidated damages clause is read to survive a mutual rescission, which by definition unwinds the parties' obligations rather than enforcing them, is a question of contract interpretation that the parties have not fully briefed and that the Court need not decide at this time.  It is enough that the issue is colorable and that, if the Guarantors prevail on mutual rescission, the liquidated damages clause may not apply at all.

As indicated, "all that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party."  *Moradi*, 673 F.2d at 727; *see Cap. Fin., LLC. v. Rosenberg*, RDB-17-2107, 2017 WL 5125515, at *2 (D. Md. Nov. 1, 2017), *report and recommendation adopted*, RDB-17-2107, 2017 WL 10188751 (D. Md. Nov. 20, 2017).  At this stage, it suffices that the Guarantors have raised an actual controversy as to liability, which is the only question Local Rule 108.1(e) puts before the Court.

The standard under Local Rule 108.1(e) is not whether the defense will certainly prevail, but whether there is "substantial and sufficient grounds for an actual controversy as to the merits." L.R. 108.1(e).  The Guarantors have presented evidence in support of the Motion that is "sufficient to persuade the fair and reasoned judgment of an ordinary man that there are substantial and sufficient grounds for an actual controversy as to the merits of the case."  *Stankovich*, 230 Md. at 432, 187 A.2d at 313.  And, because "the evidence is such that persons of ordinary judgment and prudence could fairly draw different inferences from it, the controversy should not be decided as a matter of law but instead should be submitted to a trier of fact."  *Id.*

For the foregoing reasons, the Guarantors have raised a triable dispute on mutual rescission, and that defense alone is sufficient to require vacatur of the confessed judgments.  If the factfinder credits the Guarantors' evidence and concludes that Ewing assented to Sinjin's offer to terminate the Supply Agreement, the contract on which plaintiff's claim depends ceases to exist by mutual agreement of the parties.  *Vincent*, 179 Md. at 372, 19 A.2d at 188.  The Guaranty would fall with it, and the entire premise of the confessed judgments, that Sinjin defaulted on a still-binding contractual obligation, would be undone.

Although plaintiff argues that the Court should "open" rather than "vacate" the confessed judgment, its argument is premised on the Court's granting of the Motion on the basis of a set-off. ECF 14 at 14.  A set-off, if established, would only reduce the amount plaintiff is entitled to recover. If the judgment is opened, the judgment is held in abeyance pending resolution of the offsetting claim and may stand to the extent it exceeds any set-off ultimately awarded.  *See Schlossberg*, 341 Md. at 659, 672 A.2d at 629 ("We hold that opening a confessed judgment is a procedure that allows the court to consider the merits of the defendant's defense to the action without destroying the judgment's validity. The judgment, and any judgment lien derived from it, remain in effect while the court considers the merits of the defense.").

However, because of the viability of the Guarantors' mutual rescission defense, the proper remedy is to vacate the confessed judgment.  *See Young*, 48 Md. App. at 668, 429 A.2d at 299 ("If a meritorious defense is made out . . . , the Court should liberally exercise its equitable jurisdiction over judgments entered by confession and, on application of a defendant who prima facie shows such defense, vacate the judgment to permit a trial on the merits.").  Rescission would extinguish the Supply Agreement itself, along with the obligations flowing from it, leaving no debt to support a confessed judgment in any amount.

Having concluded that the Guarantors' mutual rescission defense warrants vacating the confessed judgment, I need not address the Guarantors' remaining defenses. But, for completeness, I shall address the Guarantors' arguments that Sinjin's material breach and set-off claims independently establish a meritorious defense. As noted, those arguments, if successful, would justify opening the confessed judgments, rather than vacating them.

### 2. Ewing's Breaches

The Guarantors contend that plaintiff's claims are barred by Ewing's own breach of the Supply Agreement, the Amendment, and the Modification Agreement. As discussed, according to the Guarantors, plaintiff "improperly and secretly removed $28,075.80 from Sinjin's bank accounts which compromised its cash flow and ability to sell fuel" (ECF 7-1, ¶ 6); "sold its fuel to Sinjin at higher than the contract price" (*id.* ¶ 9); "failed to timely deliver fuel to Sinjin, forcing Sinjin to close its gas pumps on numerous occasions" (*id.* ¶ 10); "breached its agreement to install equipment at the Premises, which shut down one of Sinjin's pumps for 8 months" (*id.* ¶ 11); "breached its agreement to accept payment 11 days after delivery" (*id.* ¶ 12); "refused to deliver fuel from December of 2023 to April of 2024 and then again from approximately July of 2024 to the present" (*id.*). The Guarantors posit: "The damages caused by these breaches amount to a setoff of Plaintiff's claims . . . ." ECF 7-1 at 11. And, separate from their mutual rescission argument, the Guarantors contend that Ewing's material breaches and fraud provided Sinjin with the unilateral right to rescind or terminate the contract prior to its expiration. *Id.*

Although the Guarantors advance numerous theories of breach and set-off, I decline to address each one individually. Under Local Rule 108.1(e), the Court need not determine whether every defense raised will ultimately prevail, or even whether each independently warrants relief. Rather, I must ask whether the Guarantors have shown a "substantial and sufficient basis for an

actual controversy as to the merits of the case." L.R. 108.1(e). A single meritorious defense is enough to satisfy that standard. *See Young*, 48 Md. App. at 668, 429 A.2d at 299. Therefore, I shall focus on the defenses that, in my view, meet the threshold, without expressing any view on those I do not separately discuss.

In a confessed judgment case, a defendant may raise breach of contract as a set-off or recoupment to a plaintiff's claims. *Pease,* 416 Md. at 232, 6 A.3d at 879. And, "presenting evidence of a valid set-off constitutes a meritorious defense, requiring the judgment to be opened." *Garliss,* 97 Md. App. at 104, 627 A.2d at 68 (citation omitted); *see NILS, LLC*, 171 Md. App. at 728 ("If it is alleged that the amount due on the note should be reduced by a set-off, that is 'a defense to the claim.'").

When "there has been a material breach of a contract by one party, the other party has a right to rescind it." *Maslow*, 168 Md. App. at 323-24, 896 A.2d at 423. A material breach is one that "tends to defeat the object of the contract" and "renders the performance of the rest of the contract a thing different in substance from that which was contracted for." *Id*. at 324, 896 A.2d at 423.

Plaintiff responds to each of the Guarantors' identified breaches, in sum arguing that "Guarantors have no evidence of any such breaches or fraud by Ewing." ECF 14 at 9.

**a.**

With respect to the alleged unauthorized ACH withdrawals, plaintiff contends that the Guarantors' argument is internally contradictory. ECF 14 at 6. According to plaintiff, the Guarantors themselves concede in their Motion that the dispute over the five ACH withdrawals between June 2020 and July 2023 was "resolve[d] . . . amicably" through the parties' subsequent dealings, namely the Modification Agreement. *Id.* (quoting ECF 7-1, ¶ 7). In plaintiff's view, a

claim that has already been resolved cannot support a set-off or material breach defense, and the Guarantors cannot resurrect it now to avoid liability under the Guaranty.  *Id.*

The Guarantors counter that although Ewing and Sinjin reached an agreement to resolve certain past wrongdoing, Ewing did not substantially perform that agreement and "continued to misappropriate Sinjin's funds anyway."  ECF 17 at 8.  As the Guarantors explain in the verified Factual Background of the Motion, after Sinjin agreed to resume ACH payments, plaintiff withdrew $2,982.09 from Sinjin's account for fuel ordered by an unrelated gas station, and thereafter began making withdrawals less than eleven days after delivery, in contravention of the Modification Agreement.  ECF 7-1 at 5.

Plaintiff also argues, ECF 14 at 8, that the alleged oral Modification Agreement, which was initially intended to resolve the ACH disputes, is unenforceable because the Amendment expressly requires that the contract "may be amended only by a writing signed by all the parties hereto and not by oral statements or courses of dealing between the parties."  ECF 14-4, ¶ 5.  But, as the Guarantors point out, even if the parties' Modification Agreement was not enforceable as a contract, Sinjin may still rely upon these facts to establish a defense of promissory estoppel or waiver.  ECF 17 at 9 (citing *Pavel Enters. v. A. S. Johnson Co.,* 342 Md. 143, 166, 674 A.2d 521, 532 (1996); *Fantle v. Fantle*, 140 Md. App. 678, 686, 782 A.2d 377, 381 (2001)).  Further, the Guarantors note that Maryland law permits parties to modify written contracts orally, notwithstanding contractual provisions to the contrary. ECF 17 at 9 (citing *Richard F. Kline, Inc.,* 165 Md. App. at 277, 885 A.2d at 390).

As I see it, the enforceability, existence, and scope of any release arising from the parties' Modification Agreement is a contested factual question inappropriate to decide at this stage.  But, the Guarantors have proffered evidence sufficient to permit a fact finder to conclude that not all of

plaintiff's allegedly improper withdrawals were encompassed by the parties' resolution and that plaintiff breached the Modification Agreement.   Indeed, "persons of ordinary judgment and prudence could honestly and fairly draw different inferences from [the evidence], one favoring the plaintiff and the other the defendant," and therefore, "the court should not itself decide that conflict, but should submit it to a jury."   *Remsburg*, 212 Md. at 469, 129 A.2d at 687.   Accordingly, the defense is not foreclosed and warrants opening the confessed judgments to determine whether a set-off is justified.

**b.**

In response to the Guarantors' arguments surrounding improper pricing of fuel, plaintiff contends, ECF 14 at 7–8, that Paragraph 3(b) of the Supply Agreement bars all claims regarding "the prices charged or paid" unless asserted in writing within thirty days.   ECF 14-4, ¶ 3(b). Plaintiff argues that the defense fails because the Guarantors produced no evidence of any timely written objections to Ewing's pricing.   ECF 14 at 7–8.   In their Reply, the Guarantors maintain that their exhibits "make it clear that Sinjin did give Plaintiff written notice of the excessive pricing by written text messages."   ECF 17 at 10 (citing ECF 7-9).   Moreover, the Guarantors argue that "the documents needed to prove Plaintiff's purchase price from its supplier and sales price to Defendant's competitors is within Plaintiff's exclusive control," warranting discovery. ECF 17 at 10.

Further, with respect to the Guarantors' argument that plaintiff failed to supply fuel during certain periods, plaintiff invokes the same provision of the Supply Agreement, contending that any claim regarding "the quantity of the Product delivered" was likewise required to be raised in writing within thirty days.   ECF 14 at 8 (citing ECF 14-4, ¶ 3(b)).   The Guarantors contend that

the same text-message communications that gave notice of pricing disputes also bear on the supply issue, and that further evidence is in plaintiff's exclusive possession.  ECF 17 at 10.

In my view, whether the text messages produced by the Guarantors suffice as written notice under Paragraph 3(b) of the Supply Agreement, and whether plaintiff in fact overcharged Sinjin, are factual questions that cannot be resolved on the present record.  But, the Guarantors' evidentiary proffer of text messages is sufficient to "persuade the fair and reasoned judgment of an ordinary man that there are substantial and sufficient grounds for an actual controversy as to the merits" of the pricing defense.  *Stankovich*, 230 Md. at 432, 187 A.2d at 313.  This argument, therefore, provides another ground for opening the confessed judgments to determine whether the judgments are subject to a set-off.

### c.

Regarding the Guarantors' contention with respect to Ewing's alleged failure to install certain equipment, Ewing argues that the Guarantors' reference to an alleged "Supply Agreement Addendum on August 7, 2022" is misplaced.  ECF 14 at 9 (citing ECF 7-1, ¶ 11).  Plaintiff's argument is without merit.  Of import, Ewing misquotes the Motion, which actually references "a Supply Agreement **Amendment** on August 7, 2022."  ECF 7-1, ¶ 11 (emphasis added).  Plaintiff attached it to plaintiff's own Complaint and, as discussed, it requires Ewing to invest an "additional $20,000 of investment toward the Equipment under Addendum A of the Agreement."  ECF 14-5, ¶ 3.  And, Addendum A provides a "List of Equipment," which includes a "30' x 35' canopy."  ECF 14-4 at 7.

To be sure, the Guarantors cite a text message chain occurring between June 30, 2022 and July 4, 2022, in which Alsieux exchanged text messages with "Tom" regarding "updated quotes for canopy."  ECF 7-7; *see* ECF 7-1 at 4.  Contrary to plaintiff's assertions, the Guarantors do not

represent that this text message chain constitutes an amendment to the Supply Agreement. Rather, the Guarantors provided this text message chain as circumstantial evidence that Ewing "wrongfully delayed installing the canopy pursuant to the parties' agreement for approximately 8 months." ECF 7-1 at 4. Further, the Guarantors aver that the text messages are "evidence showing that Defendants put Plaintiff on notice of its breach." ECF 17 at 11 (citations omitted).

Ewing does not provide any other arguments to counter the Guarantors' claims that Ewing breached the Supply Agreement and subsequent Amendment with respect to the installation of new equipment. *See* ECF 14 at 9. By providing the text messages and the parties' agreements, the Guarantors have produced evidence sufficient to demonstrate "that there are substantial and sufficient grounds for an actual controversy as to the merits" of plaintiff's compliance with its installation obligations under Addendum A and the Amendment. *Stankovich*, 230 Md. at 432, 187 A.2d at 313. Standing alone, this defense would warrant opening the confessed judgment, pursuant to Local Rule 108.1(e), to determine whether the Guarantors are entitled to a set-off for plaintiff's purported breach.

**d.**

Nonetheless, plaintiff contends in a paragraph that, regardless of whether it materially breached the Supply Agreement, "a person 'seeking rescission must demonstrate that he [or she] acted promptly after discovery of the ground for rescission, otherwise the right to rescind is waived.'" ECF 14 at 9, 10 (quoting *Merritt v. Craig*, 130 Md. App. 350, 365–66, 746 A.2d 923, 931 (2000)) (cleaned up). Plaintiff avers that because Sinjin "did not promptly, or ever, rescind, or unilaterally terminate the Supply Agreement, such cannot form a basis for Guarantors to avoid their liabilities under the Guaranty." ECF 14 at 10.

36

The Guarantors counter that plaintiff's position "evinces a fundamental misunderstanding about the distinction between executory and executed contracts." ECF 17 at 11. According to the Guarantors, for executory contracts, *i.e.* contracts where substantial continued performance is contemplated, "the other party's performance is simply discharged." ECF 17 at 11 (citing *Dolan v. Kemper Indep. Ins. Co.*, 237 Md. App. 610, 620, 187 A.3d 741, 747 (2018); *Weichert Co. of Md. v. Faust*, 419 Md. 306, 320, 19 A.3d 393, 401 (2011); *Glen Alden Corp. v. Duvall*, 240 Md. 405, 430, 215 A.2d 155, 172 (1965)).

"It is well established that a material breach by one party to a contract excuses the other party from performance." *Final Analysis Commc'n Servs., Inc. v. Gen, Dynamics Corp.*, 253 F. App'x 307, 313 (4th Cir. 2007); *see Singhal & Co., Inc. v. VersaTech, Inc.*, JKB-19-01209, 2019 WL 4120434, at *5 (D. Md. Aug. 28, 2019). Further, "[u]nder basic contract principles, material breach is grounds for cancelling an agreement." *United States v. Scruggs*, 356 F.3d 539, 545–46 (4th Cir. 2004). The "general rule of bilateral contracts is that if either party materially breaches a contract, the other party is not required to perform further." *Triad Packaging, Inc. v. Supplyone, Inc.,* 597 F. App'x 734, 741 (4th Cir. 2015) (internal quotation marks omitted).

The Supply Agreement contemplated continuing performance by both parties through at least 2029, with Ewing obligated to supply fuel and equipment and Sinjin obligated to purchase a specified volume. ECF 14-4. The Guarantors' theory is that, while that performance was ongoing, plaintiff repeatedly breached its obligations to deliver fuel timely, to charge the contract price, to honor the eleven-day payment terms, and to install the required equipment. If those breaches are established, Sinjin may not have been required to formally rescind the contract before ceasing performance because its continuing duty to purchase fuel from Ewing may have been discharged.

Plaintiff's own pre-litigation conduct underscores the point. In the Default Notice, plaintiff characterized Sinjin's cessation of fuel purchases as "*de facto*" termination of the Agreement. ECF 14-7 at 2. Despite having treated Sinjin's conduct as a terminating act sufficient to trigger plaintiff's remedies under Paragraph 7(a) of the Supply Agreement, plaintiff now argues that Sinjin's failure to formally invoke rescission deprives the Guarantors of any defense premised on Ewing's alleged underlying breaches. Plaintiff cannot have it both ways. Either Sinjin's non-performance was meaningful enough to terminate the contract, or it was not.

In sum, the Guarantors have presented evidence sufficient to raise actual controversies as to whether plaintiff materially breached the Supply Agreement, the Amendment, and the Modification Agreement, and as to whether those breaches give rise to defenses of set-off, recoupment, or discharge available to Sinjin and, derivatively, to the Guarantors. *Bessette*, 148 Md. App. at 239, 811 A.2d at 825. As to the claims of breach, even if credited, none of the defenses alone would warrant vacating the confessed judgments, but they could reduce the underlying debt allegedly owed to Ewing. And, "presenting evidence of a valid set-off constitutes a meritorious defense, requiring the judgment to be opened." *Garliss*, 97 Md. App. at 104, 627 A.2d at 68.

The Guarantors need not show that they will prevail on each alleged breach, or even on any one of them. They need only proffer evidence sufficient to put the question in genuine controversy. In my view, they have done so.

### 3. Service

The Guarantors contest the validity of service on several grounds. They contend that the affidavits of service provided by plaintiff are unreliable. In particular, they argue that Alsieux was outside of the country on the date of the alleged service; that the description of the person served in the process server's affidavit, a man aged fifty to sixty, does not match Alsieux, who is forty

years old; and that 2149 Bridge Avenue is a business address rather than a dwelling, making substituted service under Maryland Rule 2-121(a)(2) unavailable.  ECF 7-1 ¶¶ 19, 20; *see also* ECF 7-5 (Affidavits of Service); ECF 7-6 (Alsieux Flight Itinerary).

Plaintiff contends that insufficient service of process is not a permissible ground for relief under Local Rule 108.1(e), which by its terms requires "substantial and sufficient grounds for an actual controversy *as to the merits of the case*" (emphasis added by plaintiff), and that service defects do not go to the merits.  ECF 14 at 5 (citing *Iliff v. American Fire Apparatus Co.*, 277 F.2d 360, 361 (4th Cir. 1960)).  Further, plaintiff argues that the Guarantors had two proper avenues to raise the defense, a pre-removal motion under Maryland Rule 2-322(a)(4) or a motion to dismiss under Federal Rule 12(b)(5), but the Guarantors did not pursue either option.  ECF 14 at 5.  Of import, plaintiff also notes in its Opposition that it sent Rule 4(d) waiver requests shortly before filing the Opposition in an effort to moot the dispute.  *Id.* at 5 n.2; *see* ECF 15-14 at 2.

On the same date as the filing of the Motion, Sinjin filed the Service Motion.  ECF 8.  In the Service Motion, Sinjin raises the same arguments as those brought in the Motion and maintains that service was defective under Maryland Rule 2-121 and Fed. R. Civ. P. 4(h).  *See* ECF 8-1 at 2, 4.

On February 11, 2026, Ewing filed proposed summonses for all three defendants (ECF 22), which the Court issued on February 17, 2026. ECF 23. On April 3, 2026, the summonses were returned executed as to all three defendants, with the affidavits of service reflecting that Alsieux was personally served on behalf of all three defendants on March 28, 2026.  *See* ECF 24 (Sinjin); ECF 25 (Bridge); ECF 26 (Alsieux).  Thereafter, on April 18, 2026, all three defendants filed an Answer and Counterclaims.  ECF 27.  They made no mention of the pending Service Motion or the defense of insufficient service.

Under Fed. R. Civ. P. 12(h)(1), a defense of insufficient service of process is waived if omitted from a responsive pleading. Thus, by Order of the Court on April 20, 2026, I denied the Service Motion, as moot. ECF 30 at 2. But, I provided Sinjin with the right to move to rescind the Order as improvidently granted, due by May 1, 2026. *Id.* Sinjin did not do so. *See* Docket.

The Guarantors' service-based ground for vacatur of the confessed judgments is moot.

### IV. Conclusion

The Guarantors have presented evidence "sufficient to persuade the fair and reasoned judgment of an ordinary [person] that there are substantial and sufficient grounds for an actual controversy as to the merits of the case." *Billingsley,* 271 Md. at 688, 320 A.2d at 37. As the Maryland Court of Appeals said, *id.* at 689, 320 A.2d at 37: "If a meritorious defense is made out . . . the Court should liberally exercise its equitable jurisdiction over judgments entered by confession and, on application of a defendant who prima facie shows such defense, vacate the judgment to permit a trial on the merits."

Therefore, for the reasons stated above, I shall vacate the confessed judgments as to Alsieux and Bridge. An Order follows, consistent with this Memorandum Opinion.


Date: May 22, 2026

                                                 /s/
                                        Ellen L. Hollander
                                        United States District Judge